**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **SANDRA M. CABRERA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **No. 10 C 4715** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | **Magistrate Judge Sheila Finnegan** |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Sandra M. Cabrera seeks to overturn the final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act. 42 U.S.C. §§ 416, 423(d). The parties consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and have now filed cross-motions for summary judgment. After careful review of the record, the Court now denies Plaintiff's motion and grants the Commissioner's motion.

## PROCEDURAL HISTORY

Plaintiff applied for DIB on March 8, 2007, alleging that she became disabled on January 5, 2005 from carpal tunnel syndrome, arthritis, and swelling in the joints and hands. (R. 139, 159.) The Social Security Administration ("SSA") denied the application initially on April 26, 2007, and again on reconsideration on August 1, 2007. (R. 72-73, 78-82, 88-91.) Pursuant to Plaintiff's timely request, Administrative Law Judge ("ALJ") Mona Ahmed held an administrative hearing on March 18, 2009. The ALJ heard testimony from Plaintiff, who appeared with counsel, and from vocational expert ("VE") Frank M. Mendrick.

A little more than four months later, on July 27, 2009, the ALJ found that Plaintiff is capable of performing a significant number of unskilled sedentary jobs available in the national economy and, thus, is not disabled. (R. 16-25.) The Appeals Council denied Plaintiff's request for review on May 24, 2010, and Plaintiff now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner. (R. 1-3.)

Plaintiff challenges that decision on the grounds that the ALJ made flawed assessments regarding her residual functional capacity and her credibility, and relied on improper VE testimony. As explained below, the Court finds substantial evidence to support the ALJ's conclusions, including that Plaintiff is capable of frequent handling and fingering, her complaints of pain lack overall consistency and are not fully credible, and there are a significant number of jobs available that she can perform.

## FACTUAL BACKGROUND

Plaintiff was born on July 18, 1965, and was 44 years old at the time of the ALJ's decision. (R. 154). She has a high school education and lives with her husband and two children. (R. 33, 166). Plaintiff worked for nearly 13 years as a general manager of a first aid supply company for school nurses, but her position was eliminated on November 30, 2004. (R. 157, 183). She did not work after that date, and claims that she became disabled shortly thereafter on January 5, 2005.

## A. Medical History

### 1. Carpal and Cubital Tunnel Syndrome

Plaintiff first complained of pain and numbness in both hands and wrists when she saw her family physician, Dr. Robert Winiecki, on January 5, 2005.[1] (R. 598). Dr. Winiecki referred Plaintiff to Dr. Christopher R. Glock of M&M Orthopaedics, Ltd., who examined her on February 4, 2005 and diagnosed "[r]ight-sided double crush syndrome with costoclavicular and carpal tunnel syndrome, as well as cubital tunnel on the right," "periclinical left wrist carpal tunnel syndrome," and "bilateral thumb trigger digits." (R. 258-60). Dr. Glock recommended Aleve, wrist braces and physical therapy. (R. 260-61). On February 25, 2005, Dr. Glock administered a steroid injection to help alleviate Plaintiff's pain, and instructed her to return in four weeks. He indicated that her "work status remains full, although she is currently not at work." (R. 258).

Plaintiff next saw Dr. Glock on March 25, 2005. She reported good relief from the injection and said that she was "happy" with the 20% to 30% improvement she felt. (R. 255-57). At a follow-up visit on April 22, 2005, Plaintiff decided to proceed with a right carpal tunnel release in the hopes of achieving more permanent relief. (R. 253-55). Dr. Glock performed the procedure on May 10, 2005, and six days later on May 16, 2005, Plaintiff was healing well and "very happy with how [the procedure] is working so far." (R. 252, 279-80). Plaintiff remained on "off work" status until June 20, 2005 when she returned to "full" work status pending a left carpal tunnel release. (R. 250-51).

---

[1] As discussed below, Plaintiff filed a workers' compensation claim alleging that her job as a general manager caused her to suffer "[r]epetitive trauma to both hands." (R. 128).

On July 7, 2005, Dr. Glock performed surgery on Plaintiff's left wrist. (R. 277-78). A few days later, on July 11, 2005, she was doing "very well" but still had some numbness and tingling in the middle, ring and small fingers of her left hand. (R. 247-48). Dr. Glock's colleague, Dr. Andrew Kim, removed Plaintiff's stitches on July 20, 2005, and on August 22, 2005, Dr. Glock released her to return to regular work activities. Plaintiff was still experiencing symptoms in her middle, ring and small fingers, however, and Dr. Glock stated that she "may very well require surgical treatment for the right cubital tunnel." (R. 245, 247).

Dr. Glock relocated his practice after that time so Plaintiff started seeing Dr. Brian A. Murphy of M&M Orthopaedics on August 31, 2005. Dr. Murphy diagnosed right cubital tunnel syndrome and recommended surgical intervention. (R. 244-45). Plaintiff underwent right subcutaneous ulnar nerve transposition on September 13, 2005. (R. 275-76). At a follow-up visit with Dr. Murphy on September 26, 2005, Plaintiff was "doing quite well," and reported that the "numbness and tingling in her fingers have almost resolved completely." (R. 242-43). On October 24, 2005, Dr. Murphy indicated that with respect to Plaintiff's right hand, he "would be happy to allow her to return to work." She still exhibited symptoms in her left hand, however, and Dr. Murphy instructed her to return in four to six weeks for further assessment. (R. 241-42).

By December 2005, Plaintiff was still experiencing left hand numbness and tingling, and a December 16, 2005 nerve conduction study was "suggestive of very early minimal ulnar compressive mononeuropathy on the left." (R. 269-70). Dr. Murphy concluded that Plaintiff would benefit from a left subcutaneous ulnar nerve transposition to address her left cubital tunnel syndrome. (R. 240). Dr. Murphy performed the surgery on January 12,

2006, and on February 24, 2006, Plaintiff reported only occasional pain when she engaged in significant lifting, and stated that the numbness and tingling had resolved completely. Dr. Murphy released Plaintiff to "her full duties at work" at that time. (R. 238, 273-74).

On April 4, 2006, Dr. Jeffrey E. Coe examined Plaintiff in connection with a workers' compensation claim she had filed based on "[r]epetitive trauma to both hands." (R. 128, 597-605). Plaintiff exhibited normal range of motion in her elbows, normal range of motion in her wrists except for a five degree loss of radial and ulnar deviation on the left side, negative Tinel's and Phalen's signs[2] at the right wrist, negative Phalen's sign and equivocal Tinel's sign at the left wrist with only localized tingling, grossly intact sensation with associated tingling dysesthesia[3] on the flexor surface of the left first through fifth fingers, grossly intact peripheral pulses of the upper extremities, and left hand tingling and pain with grip strength testing. (R. 602-04). Five months later, on September 26, 2006, Plaintiff settled her workers' compensation claim. The settlement order indicated that Plaintiff was "temporarily totally disabled from 5/10/05-6/20/05; 7/11/05-8/19/05; 9/13/05-2/26/06." (R. 128-29).

---

[2] A "Tinel's sign" is "[a]n examination test that is used by doctors to detect an irritated nerve." (http://www.medterms.com/script/main/art.asp?articlekey=16687, last viewed on April 5, 2011). A "Phalen's sign" is a test to detect carpal tunnel syndrome. (http://medical-dictionary.thefreedictionary.com/Phalen's+maneuver, last viewed on April 7, 2011).

[3] "Dysesthesia" is "an unpleasant abnormal sensation" characterized by "sensations of numbness, tingling, burning, or pain." (http://medical-dictionary.thefreedictionary.com/dysesthesia, last viewed on April 8, 2011).

## 2.    Treatment for Elbow, Back and Neck Pain (Dr. Karlsson)

On October 26, 2006, Plaintiff had a lumbar spine radiograph that showed multilevel degenerative changes, most pronounced at the L5-S1 level.  (R. 505).  Plaintiff sought treatment again shortly thereafter on November 16, 2006 due to upper and lower back pain.  (R. 237-38).  Dr. Troy R. Karlsson of M&M Orthopaedics observed that Plaintiff was significantly overweight and discussed weight loss options with her.  On examination, Plaintiff had motor strength of 5/5, full sensation, symmetric reflexes to her lower extremities, and negative straight leg raise signs.  Dr. Karlsson noted that she had "significant degenerative disc disease at several levels with disc space narrowing and end plate osteophytes," and he recommended a course of physical therapy and back exercises. (*Id.*).

Plaintiff returned to Dr. Karlsson on November 27, 2006 complaining of occasional pain in her right hand, and an absence of full function in her left hand.  (R. 236).  Dr. Karlsson observed "a Tinel sign along the course of the ulnar nerve near the wrist," "intact intrinsic function," "mildly positive Spurling test,"[4] and no changes in sensation with flexion compression test.  (R. 237).  He stated that Plaintiff "may have an overlay of cervical radiculopathy" in addition to prolonged healing of the ulnar nerve, but recommended observation only unless further problems arose.  (*Id.*).  Shortly thereafter, on December 11, 2006, Plaintiff called Dr. Karlsson because her neck and back pain were constantly at a level of 8 or 9 out of 10.  Plaintiff reported taking only Lodine at that time, and Dr. Karlsson advised her to add Ultracet.  (R. 236).

---

[4]    A "Spurling test" is an "evaluation for cervical nerve root impingement." (http://www.medilexicon.com/medicaldictionary.php?t=90833, last viewed on April 5, 2011).

On December 15, 2006, Plaintiff saw Dr. Karlsson again for her upper shoulder and back pain, plus additional pain down the right leg and left arm. (R. 235). Plaintiff continued to exhibit motor strength of 5/5 to her lower extremities, symmetric reflexes and no gross loss to the upper extremities. She had some discomfort with a straight leg raise test on the right into the thigh, however, and pain between her shoulder blades. (R. 235-36). Dr. Karlsson ordered an MRI of the cervical spine, which Plaintiff had on December 21, 2006. The test was negative for disc herniation, and the left-sided neural foramina appeared patent. At the same time, there was "posterior lateral right sided spur which narrows the right sided neural foramina C3-C4 level." (R. 271-72). An MRI of the lumbar spine performed the same day showed multilevel small disc bulges but no herniation. The test further revealed "mild right sided neural foraminal narrowing at the L5-S1 level secondary to far lateral disc bulging." (R. 300-01, 323-24).

Dr. Karlsson reviewed the MRI results with Plaintiff on December 29, 2006. He noted "some slight neuroforaminal narrowing" at L5-S1 and "mild narrowing" at C3-C4, but "[n]o severe changes." (R. 235). On physical examination, Plaintiff exhibited motor strength of 5/5, full sensation, symmetric reflexes and negative straight leg raise signs. Dr. Karlsson determined that in the absence of evidence of severe disc herniations or bulges, Plaintiff's treatment should focus on pain management. (*Id.*).

**3.  Continued Treatment for Elbow, Back and Neck Pain (Drs. Cavalenes, DePhillips and Chami)**

On January 4, 2007, Plaintiff started seeing Dr. Mark P. Cavalenes of Community Orthopedics. Her "biggest problem" at that time was low back and left elbow pain, though she also complained of residual numbness in three fingers of her left hand. (R. 298). Dr.

Cavalenes diagnosed pain syndrome, arthritis of the elbow, fibromyalgia, and status-post bilateral carpal tunnel syndrome and ulnar nerve transpositions. He recommended a short course of cortisone, with an injection to her elbow. (R. 297). One week later, on January 11, 2007, Plaintiff's back was not any better and she could barely flex to mid-calf. Her left arm and elbow were 25% to 30% better, however, and she had full range of motion from 0 to 140 degrees. (R. 296). Dr. Cavalenes observed that Plaintiff's grip strength in her left hand was actually stronger, she had full wrist flexion-extension, and supination-pronation was 90/90 without any discomfort. He gave Plaintiff another elbow injection and recommended observation. (*Id.*).

By January 25, 2007, Plaintiff's elbow discomfort was no better. Dr. Cavalenes diagnosed "[r]esolving elbow arthritis and persistent lateral epicondylitis [inflammation of a rounded projection at the end of a bone]," and gave her another cortisone injection. (R. 294). Plaintiff's elbow pain returned on February 8, 2007, and this time Dr. Cavalenes diagnosed hypersensitivity secondary to inflammation in the elbow, chronic pain syndrome, and "[l]ateral epicondylitis, resolving, left arm." (R. 291). Plaintiff received another injection in her elbow, and Dr. Cavalenes referred her to Dr. George E. DePhillips for a neurosurgical consultation. (R. 291, 463). On February 12, 2007, Dr. DePhillips opined that Plaintiff had degenerative disc disease at multiple levels of her spine as well as inflammation, and stated that her only option was epidural steroid injections. (R. 463).

When Plaintiff saw Dr. Cavalenes again on February 22, 2007, her right arm was 20% better, and she had full range of motion from 0 to 140 degrees with only mild discomfort with the last 20 degrees of flexion, as well as full pronation and supination of

90/90. Dr. Cavalenes diagnosed "[p]ain syndrome resolving inflammatory process secondary to nerve transposition both elbows more on the left than the right." (R. 288).

The next day, on February 23, 2007, Plaintiff started seeing Dr. Antoine Chami of Pain Care Specialists, L.L.C., for help with her back and neck pain. Dr. Chami found that Plaintiff's lower back was nontender to palpation, but she had "significant decrease in range of motion to extension at less than 10 degrees and forward flexion at approximately 30 to 45 degrees." Left-sided flexion elicited mid low back pain, right-sided flexion caused radiating pain into the right buttock, and Plaintiff exhibited an antalgic gait favoring the right side. (R. 310). A straight leg raise test was positive bilaterally at 45 degrees on the left with mid low back pain, and 30 to 45 degrees on the right with radiating pain in the right buttock and hip. Plaintiff could elevate on her heels and toes without limitation, however, and had full motor strength of 5/5, intact sensation "in all the major dermatomes of the lower extremity," and deep tendon reflexes of 2+ (normal) on both sides. (R. 311). Dr. Chami diagnosed degenerative disc disease and lumbosacral radiculopathy, and proceeded with a trial of selective nerve root injections at L5-S1. (R. 308-09, 311).

Plaintiff went for a follow-up visit with Dr. DePhillips on March 14, 2007. She reported that her last steroid injection did not relieve her lower back pain, which she described as a level 7 to 8 out of 10, and she complained of neck and interscapular pain and pain radiating into both upper extremities. Her leg pain had improved significantly, however, and she planned to start physical therapy for her neck pain and degenerative cervical disc disease. Although he had only seen Plaintiff once before, Dr. DePhillips opined that she was "not capable of gainful employment and is permanently disabled." (R. 462).

Plaintiff began physical therapy with ATI on March 20, 2007, but was ultimately discharged on June 28, 2007 because she was not progressing. (R. 471-75). In the meantime, on March 22, 2007, Plaintiff returned to Dr. Cavalenes and reported continued discomfort in her left arm, a "little" discomfort in her right arm, but no forearm pain. She also complained of "some pain and stiffness in her hand," which Dr. Cavalenes believed was "more just inflammation." Dr. Cavalenes found moderate tenderness over the medial epicondyle on the left, mild tenderness on the right, and slight tenderness over the left lateral epicondyle. He diagnosed painful ulnar nerve transposition and suggested Plaintiff try Lyrica to help with the pain. (R. 367).

On April 6, 2007, Dr. Chami administered additional nerve root injections. (R. 306-07). Less than two weeks later, on April 19, 2007, Plaintiff told Dr. Cavalenes that her pain was 40% better overall, but she had started having increased pain in her right shoulder. Dr. Cavalenes determined that Plaintiff had moderate to severe tenderness in the trapezius (shoulder), levator scapular (neck), and rhomboid (back) muscles. He instructed her to continue taking Lyrica and return in six weeks. (R. 365).

Plaintiff saw Dr. DePhillips on May 7, 2007, complaining of lower back pain radiating into the right posterior thigh to the knee. She described the pain as a level of 7 to 8 out of 10 notwithstanding her February 2007 steroid injections. Dr. DePhillips noted that Plaintiff complained of neck pain, headaches and numbness in both upper extremities, and that she was undergoing physical therapy. He recommended that she consult with Dr. Glock[5]

_____

[5] It appears that Dr. DePhillips was unaware that Dr. Glock (whom Dr. DePhillips mistakenly identified as Dr. Flock) had relocated his practice and was no longer treating Plaintiff.

regarding lumbar disc decompression treatments, and have another epidural cervical steroid injection for her neck pain. (R. 461, 492). Dr. Chami administered the cervical intra-laminar epidural steroid injection on May 18, 2007. (R. 389-90).

On May 24, 2007, Plaintiff presented to Dr. Cavalenes with increased discomfort in her elbow, explaining that she was taking Lyrica less frequently. Dr. Cavalenes found continuing tenderness over the left medial epicondyle, the right carpometacarpal joint, and the flexor tendons volarly at the metacarpophalangeal joint of the long and ring fingers. He diagnosed diffuse inflammatory process and told Plaintiff to start taking Lyrica three times a day again. (R. 363). Shortly thereafter on June 6, 2007, Plaintiff complained to Dr. DePhillips that she was still experiencing neck pain, headaches, bilateral shoulder pain that was worse on the right side, and interscapular pain. Dr. DePhillips recommended an MRI of the thoracic spine plus additional epidural and trigger point injections. (R. 461, 491).

Dr. Chami administered another cervical intra-laminar epidural injection on June 14, 2007. (R. 384-85). Plaintiff's June 28, 2007 MRI was negative for disc herniation, but at an appointment on July 2, 2007, Dr. DePhillips said that it showed disc degeneration at the T7-T8 and T8-T9 levels. He explained to Plaintiff that surgery was "definitely a last resort," and recommended that she "begin treatment" with Dr. Glock though, as noted, he had relocated his practice and had stopped seeing Plaintiff in August 2005. (R. 461, 584).

### 4. Treatment for Back and Neck Pain (Dr. Patel)

On March 4, 2008, Plaintiff started seeing Dr. Udit Patel at the Pain & Spine Institute. She complained of chronic pain primarily in the mid cervical and lumbar spine, radiating to both shoulders and upper arms, as well as the right buttock, right posterior thigh, right calf and right foot. Plaintiff described the pain as constant and moderate in

11

intensity, with an aching, burning and stabbing sensation. She also noted some numbness and weakness in her legs. Dr. Patel found Plaintiff to have "back pain (chronic), joint stiffness and myalgias [muscle pains]," and paresthesia (numbness or tingling) in the right lower extremity. (R. 522). He diagnosed low back pain, lumbar radiculopathy and spinal osteoarthritis, and worked to streamline her medications. In addition to Lyrica, Dr. Patel prescribed the long-acting narcotic Avinza (morphine), along with Cymbalta and Norco. (R. 523).

Over the course of the next year, Dr. Patel performed a series of Diagnostic Medial Nerve Branch Blocks ("DMBB") and Radiofrequency Ablations ("RFA")[6] on Plaintiff's right and left lumbar and thoracic spine. A right-sided lumbar DMBB at L2-L5 on March 12, 2008 provided relief, so Dr. Patel administered the same treatment to the left side on March 18, 2008. (R. 525-30). Plaintiff again reported mild pain relief so Dr. Patel performed a right-sided lumbar RFA at L2-L5 on April 2, 2008. (R. 531-33). By April 18, 2008, Plaintiff's right side had improved by about 30%, and Dr. Patel performed a left-sided lumbar RFA at L2-L5 that day. (R. 534-36). At a follow-up visit on May 2, 2008, Plaintiff reported "some relief of the pain on the left side with minor relief on the right side." (R. 537-38).

On May 16, 2008, Plaintiff told Dr. Patel that she "now feels that the right lumbar side has significantly improved in terms of pain." (R. 539). The left side had also improved

---

[6]      "DMBB" is "the procedure that is used to determine whether one or more facet joints is the source of neck or low back pain." http://www.spinecare.com/treatments/injections.html, last viewed on April 20, 2011). "RFA" is "a procedure used to reduce pain." Specifically, "[a]n electrical current produced by a radio wave is used to heat up a small area of nerve tissue, thereby decreasing pain signals from that specific area." (http://www.webmd.com/pain-management/radiofrequency-ablation, last viewed on April 20, 2011).

but still had "some way to go." Dr. Patel performed a right-sided thoracic DMBB at T8-T11, followed on May 28, 2008 by a right-sided thoracic DMBB at T1-T4. (R. 539-43). Plaintiff was still complaining of some significant upper back pain on June 3, 2008, though she reported being "overall ok." She had a right-sided thoracic RFA at T1-T4 at that time. (R. 544-46).

Plaintiff next saw Dr. Patel on August 6, 2008 when she reported continuing middle back pain. (R. 547-48). On August 13, 2008, she had a right-sided thoracic DMBB at T1-T5. (R. 549-51). Shortly thereafter on August 21, 2008, Plaintiff had an electrodiagnostic nerve study ("EMG"). The test showed very severe impairment (+5) of the left axillary nerve, marked impairment (+3) of the left ulnar nerve, and mild impairment (+1) of the right radial nerve. (R. 552, 581). Also on August 21, 2008, Dr. Patel performed a left-sided thoracic RFA at T1-T5. (R. 553-55). At a follow-up visit on September 8, 2008, Plaintiff stated that her upper thoracic spine had improved and she had "complete resolution of the pinching feeling in her base of neck." She felt that her lower back, however, was "starting to act up again." (R. 556-57). On October 10, 2008, Dr. Patel performed a right-sided lumbar DMBB at L2-L5. (R. 558-60). He followed this with a left-sided thoracic DMBB at T9-T12 on October 15, 2008. At that time, Plaintiff's main complaint was left lower thoracic pain and right lower lumbar pain. (R. 561-63).

Plaintiff achieved relief from the thoracic DMBB but told Dr. Patel on November 10, 2008 that she was experiencing some arthritic-type pain in her wrists, fingers, knees and ankles. (R. 564-65). Nine days later, on November 19, 2008, Dr. Patel performed a right-sided lumbar RFA at L2-L5. (R. 566-68). On January 13, 2009, Plaintiff reported "good relief on the right lumbar levels," and stated that her lower back was "stable." Plaintiff's

primary complaint was moderate, constant, aching neck and lower back pain causing headaches, neck stiffness and left upper extremity paresthesia. (R. 569-70). Three days later, on January 16, 2009, Dr. Patel performed a left-sided thoracic RFA at T9-T12. (R. 571-73). The RFA provided good relief of Plaintiff's back pain in the thoracic area, but she still complained of right-sided back and neck pain. (R. 574-75). On February 20, 2009, Plaintiff had a right-sided thoracic RFA at T8-T11. (R. 576-78). Her back pain was better by March 4, 2009, but she reported increased pain over the neck area. (R. 579-80).

Plaintiff's last treatment records consist of MRIs of the cervical and lumbar spine taken on May 14, 2009. The cervical MRI showed a small right paracentral disc protrusion at C3-C4 that "minimally effaces the right lateral aspect of the thecal sac but does not cause significant central canal stenosis." There was moderate right-sided neural foraminal narrowing at C3-C4, but the left neural foramen was "widely patent." (R. 608-09). The lumbar MRI showed diffuse changes of degenerative disc disease and focal disc protrusions throughout the lumbar spine. Plaintiff had a "mild degree of central canal stenosis" in the "upper to mid lumbar segments," as well as varying degrees of neural foraminal stenosis from L1-L5/S1. The stenosis was most severe on the right side at L5-S1 where "moderate right-sided neural foraminal narrowing is present." The radiologist recommended "[c]orrelation with a dermatome of [Plaintiff's] pain." (R. 610-11).

### 5. State Agency Assessments

On April 23, 2007, Dr. Francis Vincent performed a Physical Residual Functional Capacity Assessment of Plaintiff for the Bureau of Disability Determination Services ("DDS") in connection with her March 8, 2007 application for disability benefits. (R. 344-51). Dr. Vincent found that Plaintiff could occasionally lift and/or carry 20 pounds,

frequently lift and/or carry 10 pounds, sit, stand and/or walk for 6 hours in an 8-hour workday, and push and/or pull without limitation. (R. 345). He assessed no postural or manipulative limitations, noting that Plaintiff "has pain but [is] able to do fine and gross manipulations." (R. 346-47). Dr. Richard Bilinsky affirmed Dr. Vincent's assessment on July 27, 2007. (R. 496-98).

## B.    Plaintiff's Testimony

At the March 18, 2009 hearing, Plaintiff testified that she cannot work because of daily pain in her arms, hands, shoulders, neck, back, legs and feet. She has difficulty getting out of bed in the morning due to pain and stiffness, and her mother comes over to help with the housework and cooking three days a week. Plaintiff buys ingredients pre-cut and has to sit at a table to prepare her meals. In addition, she can only vacuum for five or ten minutes with breaks. (R. 36, 40, 49).

On a typical day when her mother does not come over to help, Plaintiff sits, walks around, uses cold packs, watches television, folds laundry for about 10 minutes, and makes a simple dinner such as spaghetti and meat sauce. (R. 47-48). Sitting for more than 15 or 20 minutes at a time is difficult because her back starts aching, and she periodically needs to stand up and move around to avoid getting stiff. (R. 36, 41). By way of example, Plaintiff testified that after sitting in the car for 35 minutes to drive to the hearing, her mother had to help her get her right leg out of the vehicle because she was so stiff and weak from the pain that she could not move it. (R. 41-43, 45). Her husband has to bathe the children, and she cannot reach above or too far in front due to pain. (R. 37). She does drive about a block and a half twice a day, three times per week, however, to take her kids to and from school. (R. 35, 47).

With respect to her medical treatment, Plaintiff testified that the DMBB and RFA treatments were not helping much, so Dr. Patel referred her to a rheumatologist in October 2008. (R. 38). She had not yet seen the rheumatologist, however, because of difficulties scheduling an appointment. (R. 55-57). Plaintiff agreed that her back was better, but stated that she had increased neck pain and had not yet received any related neck procedures from Dr. Patel. (R. 39). She also stated that Dr. Cavalenes and Dr. Patel had both told her that she has fibromyalgia. (R. 52-54).

Plaintiff does not think that she could work at a consistent pace throughout the day because of arthritis in her hands and difficulty turning and bending her neck. (R. 50-51). In addition, she has memory problems, and her medications make her drowsy so that she dozes off during the day when the kids are not home. (R. 41, 48-49).

## C.    Vocational Expert Testimony

Mr. Mendrick testified at the hearing as a VE. He said that general manager positions are usually considered light work, but that Plaintiff had performed her past job at a medium and skilled level. (R. 59). The ALJ asked the VE to consider a hypothetical person of Plaintiff's age, education and work history, who: could perform sedentary work, including lifting up to 10 pounds, standing and walking up to two hours in short periods of time, and sitting for 6 hours in an 8-hour workday; needed to sit and stand at will; and could not engage in any overhead reaching. (R. 61). The VE testified that such an individual could work as a cashier (4,000 jobs), inspector (1,200 jobs) or hand packer/sorter (1,500 jobs). (R. 60, 62). He acknowledged that the Dictionary of Occupational Titles ("DOT") characterizes cashier work as light based on the requirements at large supermarkets, but

he explained that in his experience, smaller establishments such as restaurants, privately-owned operations and racetracks allow cashiers to be seated.  (R. 62, 64-65).

The ALJ next asked the VE to consider the same hypothetical individual who could also engage in frequent but not constant fingering and handling.  The VE testified that such a person could perform the same jobs listed previously.  If, however, the person could finger and handle only occasionally, then less than three percent of the stated jobs would remain available.  (R. 62-63).  There also would be no jobs available to a person who missed work more than seven days a year.  (R. 63).

In response to questions from Plaintiff's attorney, the VE stated that employees cannot have two extra breaks during the day in addition to a regular morning, lunch and afternoon break.  (R. 66).  Employees are also expected to achieve a certain level of productivity, and will not be able to hold a job if they fall below that level because pain or some other factor takes them off task.  (R. 67-70).

### D.    The ALJ's Decision

The ALJ found that Plaintiff's "status post carpal tunnel syndrome surgery and cubital tunnel syndrome," degenerative disc disease, possible fibromyalgia, and obesity are all severe impairments, but that they do not alone or in combination meet or equal those listed in the Social Security Regulations.  (R. 18).  The ALJ determined that Plaintiff cannot perform her past work as a general manager, but found that she retains the residual functional capacity ("RFC") for unskilled, sedentary work that allows her to sit/stand at will, requires only occasional overhead reaching, and limits her to frequent but not constant handling and fingering.  (R. 19, 23-24).

In reaching this conclusion, the ALJ discussed in detail the medical evidence and found that it did not fully support Plaintiff's allegations of disabling pain. The ALJ noted, for example, that despite complaints of hand pain and weakness, "the focus of [Plaintiff's] subsequent medical care [following carpal and cubital tunnel surgery] is related to non-specific pain allegations in the neck, low back and mid back." (R. 22). In that regard, the ALJ found it significant that MRI studies showed only "small," "mild," or at most "moderate" abnormalities that did not necessitate surgical intervention. (R. 20-22). In addition, clinical examinations consistently showed "normal strength, sensation, reflexes, and negative straight leg rising." (R. 22). The ALJ recognized that objective abnormalities are not always present with a diagnosis of fibromyalgia, but found no record evidence of any tender points typically associated with that impairment. (*Id.*).

As for Plaintiff's multiple injections, the ALJ stated that medical records indicate the treatment provided some benefit, but agreed that the "intensity of management lends support to [Plaintiff's] allegations" of continuing pain. The ALJ also noted that Plaintiff takes a variety of medications, including extended-release narcotics "with a likely sedating effect," and has consistently sought pain treatment. Based on those findings, the ALJ limited Plaintiff to sedentary, unskilled work that "involves little judgment to do simple tasks that can be learned on the job in a short period of time." (*Id.*). The ALJ accepted that Plaintiff has "slight residuals" from the carpal tunnel surgery, but stressed that the emphasis of her treatment focused on other pain complaints. The ALJ thus concluded that Plaintiff is capable of "frequent (but not constant) handling and fingering." (*Id.*).

The ALJ factored Plaintiff's limited activities of daily living into the sedentary RFC, but found her testimony "extreme and perhaps overstated" in light of the objective medical

evidence. In particular, the ALJ was not persuaded that Plaintiff could not move her legs after riding in a car for 35 minutes on the way to the hearing, as "objective examinations document no lower extremity weakness." (R. 23). The ALJ acknowledged that Plaintiff's good work history bolstered her credibility, but also stressed that she stopped working because her position was eliminated and not due to her impairments. The ALJ further noted that the steroid injections "are providing some benefit," and that Plaintiff's "allegations lack overall consistency, as the location of her pain changes over time." In addition, Plaintiff was involved in a workers' compensation claim "which may well have detracted from her motivation to work." (*Id.*).

The ALJ agreed with the VE that Plaintiff can work as a cashier (4,000 jobs), inspector (1,200 jobs) or hand laborer/sorter (1,500 jobs). (R. 24). The ALJ expressly noted that the DOT classifies cashier jobs as light work, but she accepted the VE's explanation that employees may sit down in many establishments other than large supermarkets. (R. 23-24). As a result, the ALJ concluded that Plaintiff is not disabled within the meaning of the Act. (R. 24).

<u>**DISCUSSION**</u>

**A.     Standard of Review**

Judicial review of the Commissioner's final decision is authorized by § 405(g) of the Social Security Act. *See* 42 U.S.C. § 405(g). In reviewing this decision, the court may not engage in its own analysis of whether Plaintiff is severely impaired as defined by the Social Security Regulations. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004) (citation omitted). Nor may it "displace the ALJ's judgment by reconsidering facts or evidence or making credibility determinations." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007).

19

The court's task is to determine whether the ALJ's decision is supported by substantial evidence, which is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007) (quoting *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004)). In making this determination, the court must "look to whether the ALJ built an 'accurate and logical bridge' from the evidence to [his] conclusion that the claimant is not disabled." *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009) (quoting *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008)). Where the Commissioner's decision "'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand is required." *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009) (quoting *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002)).

## B.     Five-Step Inquiry

To recover DIB under Title II of the Social Security Act, a claimant must establish that she is disabled within the meaning of the Act. 42 U.S.C. § 423(d); *Crawford v. Astrue*, 633 F. Supp. 2d 618, 630 (N.D. Ill. 2009). A person is disabled if she is unable to perform "any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." *Id.*; *Strocchia v. Astrue*, No. 08 C 2017, 2009 WL 2992549, at *14 (N.D. Ill. Sept. 16, 2009). In determining whether a claimant suffers from a disability, the ALJ conducts a standard five-step inquiry: (1) Is the claimant presently unemployed? (2) Is the claimant's impairment severe? (3) Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations? (4) Is the claimant unable to perform her former occupation? and (5) Is the

claimant unable to perform any other work?  *See* 20 C.F.R. §§ 404.1520, 416.920; *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000).

**C.  Analysis**

Plaintiff argues that the ALJ's decision must be reversed because she erred in finding Plaintiff capable of frequent handling and fingering.  Plaintiff also claims that the ALJ's credibility determination is not supported by substantial evidence, and that she improperly relied on the VE's testimony regarding available jobs.  As explained below, the Court does not find any of these arguments persuasive.

**1.  The RFC Assessment**

Plaintiff first objects that there is no objective medical support for the ALJ's conclusion that she is capable of frequent handling and fingering.  Plaintiff focuses primarily on Dr. Coe's April 4, 2006 workers' compensation examination and report, which recounted her history of carpal and cubital tunnel surgeries, and documented "associated decreased range of motion of the left wrist in extension, [and] radial and ulnar deviation with a mild irritation of the median nerve continuing at the left wrist and hand."  (R. 604).  Dr. Coe also found that Plaintiff had "tingling dysesthesia on the flexor surface of the left first through fifth fingers."  (R. 603).  Plaintiff claims that the ALJ failed to explain how this evidence translates into an ability to frequently finger and handle.  (Doc. 28-1, at 9).  The Court disagrees.

As Plaintiff concedes, the ALJ expressly discussed Dr. Coe's report that Plaintiff had "decreased range of motion in the left wrist, and 'mild' evidence of continued nerve irritation."  (R. 20).  The ALJ also noted, however, that most of Plaintiff's medical care after April 2006 focused on back and neck pain.  (R. 22).  Significantly, Plaintiff's own hand

surgeon, Dr. Murphy, released her to "full duties at work" in February 2006. (R. 20, 238).

On November 27, 2006, Plaintiff did complain to Dr. Karlsson of occasional pain in her right

hand, and an absence of full function in her left hand. (R. 20, 236). Dr. Karlsson observed

a Tinel's sign reflecting irritation "along the course of the ulnar nerve near the wrist" and a

"mildly positive" Spurling test, but "intact intrinsic function" and no changes in sensation with

flexion compression test. (R. 237). Dr. Karlsson recommended observation only unless

further problems arose, and there is no evidence that Plaintiff sought additional hand

treatment from him or any other doctor. (*Id.*).

In addition, in April 2007, more than a year after Dr. Coe examined Plaintiff, Dr.

Vincent found that she "has pain but [is] able to do fine and gross manipulations" without

limitation, an assessment affirmed by Dr. Bilinsky in July 2007. (R. 21, 347). Plaintiff

points to no other treating or consulting physician who imposed greater limitations on her

hand movements.[7] *See Compean v. Astrue*, No. 09 C 5835, 2011 WL 1158191, at *8 (N.D.

Ill. Mar. 28, 2011) (citing *Rice v. Barnhart*, 384 F.3d 363, 370 (7th Cir. 2004)) (the ALJ "was

entitled to rely upon the opinion of the state agency physician, particularly where no

physician imposed any greater functional limitations than those found by the ALJ in her

RFC determination.")

Plaintiff claims that the opinions of Dr. Vincent and Dr. Bilinsky do not in fact support

the ALJ's RFC. (Doc. 28-1, at 8 n.4). It appears that Plaintiff takes issue with the fact that

_____

[7]        Plaintiff does cite Dr. Coe's statement that "the repetitive strain injuries have
caused permanent partial disability to both arms." (R. 605). Dr. Coe saw Plaintiff only one
time, however, and gave his opinion in the context of a workers' compensation claim. It is
well-established that "conclusory statements about whether Claimant was 'disabled' are . .
. not medical opinions, but instead 'administrative findings dispositive of a case.'" *Ulloa*,
611 F. Supp. 2d 796, 811-12 (N.D. Ill. 2009).

rather than simply adopting the state agency medical opinions, the ALJ went a step further in her analysis and accepted that Plaintiff "did periodically report problems with her hands" following her various surgeries. As a result, the ALJ determined that Plaintiff can engage in only frequent, and not constant handling and fingering. (R. 22). Plaintiff is correct that this is more restrictive than the state agency consultants' findings of no manipulative limitations whatsoever, but the ALJ fairly credited Plaintiff's testimony in that regard and modified the RFC assessment accordingly. *See, e.g., Castile v. Astrue*, 617 F.3d 923, 929 (7th Cir. 2010) (finding no error where "[i]t was because of and not in spite of [the claimant's] testimony that the ALJ limited her to a more restrictive residual functional capacity finding than any physician on the record.")

Plaintiff also argues that the ALJ failed to consider her "tingling dysesthesia," which she claims adversely impacts her ability to engage in hand manipulations. (Doc. 28-1, at 9). As noted, however, the ALJ did mention Dr. Coe's evaluation and Plaintiff's continued complaints of hand problems following the surgeries. The mere fact that the ALJ did not include the phrase "tingling dysesthesia" does not mean that the decision lacks an adequate discussion of the hand issue. *See Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010) ("A decision denying benefits need not discuss every piece of evidence.")

In a footnote, Plaintiff finally claims, without elaboration, that her August 2008 EMG findings "tend to substantiate greater limitations on handling/fingering than recognized by the ALJ." (Doc. 28-1, at 14 n.6). The ALJ did not discuss these test results, a matter the Court addresses below. In any event, the EMG was administered by Dr. Patel, who was not treating Plaintiff for hand problems and did not diagnose any hand limitations based on the test results. In addition, Plaintiff never sought additional hand treatment after August

2008, nor did Dr. Patel recommend any. Plaintiff cites no medical authority for her theory that the EMG results limit her to less than frequent handling and fingering, and her conclusory footnote is not persuasive. *See United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991) ("[P]erfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived."); *Moss v. Astrue*, No. 09-1196, 2010 WL 2572040, at *5 (C.D. Ill. June 22, 2010). The Court finds nothing improper about the ALJ's determination that Plaintiff can frequently but not constantly handle and finger, and will not remand the case on that basis.

### 2. Plaintiff's Credibility

Plaintiff next argues that the ALJ erred in finding that her testimony regarding the limiting effects of her symptoms was not fully credible. In assessing a claimant's credibility, an ALJ must first determine whether the symptoms are supported by medical evidence. *See* SSR 96-7p, at 2; *Arnold v. Barnhart*, 473 F.3d 816, 822 (7th Cir. 2007). If not, SSR 96-7p requires the ALJ to consider "the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and other relevant evidence in the case record." *Id.* (quoting *Carradine v. Barnhart*, 360 F.3d 751, 775 (7th Cir. 2004)). *See also* 20 C.F.R. § 404.1529. Because hearing officers are in the best position to evaluate a witness's credibility, their assessment should be reversed only if "patently wrong." *Simila*, 573 F.3d at 517; *Elder v. Astrue*, 529 F.3d 408, 413-14 (7th Cir. 2008).

In this case, the ALJ found that Plaintiff's reported pain level was not supported by the objective medical evidence. For example, the December 2006 MRIs showed no disc herniation, and only "small" multilevel bulges and "mild" neural foraminal narrowing in the lumbar spine. (R. 20). A June 28, 2007 MRI was similarly negative for disc herniation, and May 14, 2009 MRIs showed a "small" disc protrusion at C3-C4, "minimal[]" effacement of the right lateral aspect of the thecal sac, no significant central canal stenosis, diffuse degenerative disc changes and protrusions, and a "mild degree" of central canal stenosis. (R. 21-22). The ALJ acknowledged that one of the May 2009 MRIs also showed "moderate" right-sided neural foraminal narrowing at C3-C4, but noted that Plaintiff's physicians did not view this or the other findings as necessitating surgical intervention. (R. 22). The ALJ further observed that clinical examinations consistently showed "no significant abnormalities," including "normal strength, sensation, reflexes, and negative straight leg rising." (R. 22, 235-37, 311). With respect to Plaintiff's possible fibromyalgia diagnosis, moreover, the ALJ found no characteristic tender points to support Plaintiff's pain allegations. (R. 22).

Plaintiff first claims that the ALJ improperly omitted any reference to her August 21, 2008 nerve conduction study ("EMG") showing very severe impairment of the left axillary nerve and marked impairment of the left ulnar nerve in the left arm, and mild impairment of the right radial nerve in the right arm. (R. 581). Defendant concedes the point, but argues that any error in that regard is harmless. *See Keys v. Barnhart*, 347 F.3d 990, 994 (7th Cir. 2003) ("[T]he doctrine of harmless error . . . is fully applicable to judicial review of administrative decisions."); *Scott v. Astrue*, 730 F. Supp. 2d 918, 935 (C.D. Ill. 2010) ("Harmless errors are those that do not affect the ALJ's determination that a claimant is not

entitled to benefits.")  Defendant stresses that the ALJ did discuss the treatment administered by Dr. Patel, who ordered the EMG, and notes that Dr. Patel "did not change his treatment plan in response to the EMG results."  (Doc. 32, at 12-13).  Defendant also claims that the ALJ reduced Plaintiff's RFC based in part on Dr. Patel's treatment.  (*Id.* at 13).

Plaintiff responds only that these constitute "post hoc rationalizations . . . and cannot cure errors of omission made by the ALJ."  (Doc. 36-1, at 4).  It is true that an ALJ cannot selectively discuss only evidence that favors his ultimate conclusion."  *Gfesser v. Astrue*, No. 09 C 5151, 2010 WL 3385515, at *11 (N.D. Ill. Aug. 25, 2010) (citing *Smith v. Apfel*, 231 F.3d 433, 438 (7th Cir. 2000)).  *See also Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009) ("An ALJ may not selectively consider medical reports.")  Here, however, the ALJ accepted that Plaintiff's documented abnormalities cause limitations that include her left arm.  The ALJ restricted Plaintiff to only occasional overhead reaching and less than constant fingering and handling, and neither Dr. Patel nor any other physician indicated that Plaintiff is more limited based on the EMG results or otherwise.[8]  Aside from stating that he "spent time . . . discuss[ing] the [EMG] results" with Plaintiff on August 21, 2008, Dr. Patel did not elaborate on those findings or recommend that she seek any additional care or evaluation.  (R. 553).  Nor did Dr. Patel factor the EMG results into his treatment plan, instead pursuing more DMBBs and RFAs as before.  Plaintiff has not presented any

---

[8]    Like Dr. Coe, Dr. DePhillips opined after seeing Plaintiff one time that she is "not capable of gainful employment and is permanently disabled."  (R. 462).  As noted, "conclusory statements about whether Claimant was 'disabled' are . . . not medical opinions, but instead 'administrative findings dispositive of a case.'"  *Ulloa*, 611 F. Supp. 2d at 811-12.  Plaintiff does not challenge the ALJ's decision to give this statement "little weight."  (R. 23).

evidence suggesting that the severe and marked findings in her left arm prove that she cannot perform the RFC set forth by the ALJ, or establish that her testimony deserved more credence.

In that regard, the ALJ looked beyond the medical evidence and considered a variety of other factors that weighed against Plaintiff's credibility. The ALJ stressed, for example, that Plaintiff stopped working because her position was eliminated and not due to her impairments, and noted her involvement in a workers' compensation claim "which may well have detracted from her motivation to work." (R. 23). The ALJ also found that Plaintiff "may be overstating her limitations" based on her testimony that she could not move her right leg after riding in the car for 35 minutes. As the ALJ explained, "objective examinations document no lower extremity weakness, [so] it is not clear why [Plaintiff] would be unable to move her legs." (*Id.*).

Plaintiff argues that she actually complained of stiffness in her right leg, not weakness, and claims that the ALJ made a mistaken medical assumption that only weakness could account for an inability to move that extremity. In fact, the ALJ accurately observed that none of Plaintiff's physicians documented symptoms that would account for the claimed loss of movement in her legs. (R. 45). Plaintiff's attorney mentioned paresthesia (numbness and tingling), but there is no medical evidence that Plaintiff was ever incapable of moving her legs due to this or any other condition. To the contrary, clinical examinations consistently showed "normal strength, sensation, reflexes, and negative straight leg rising." (R. 22). On these facts, the ALJ was not patently wrong in concluding that Plaintiff may have overstated her limitations regarding leg movement.

*Castile*, 617 F.3d at 929 ("[W]e give [an ALJ's] opinion a commonsensical reading rather than nitpicking at it.")

Nor did the ALJ improperly discount the severity of Plaintiff's hand problems. (Doc. 28-1, at 10-11). The ALJ discussed Plaintiff's hand surgeries, as well as Dr. Coe's report that Plaintiff had "decreased range of motion in the left wrist, and 'mild' evidence of continued nerve irritation." (R. 20). As noted, however, the ALJ also observed that Dr. Murphy released Plaintiff to full work duties in February 2006, and Dr. Karlsson "recommended simple observation" in November 2006. (*Id.*). After that date, Plaintiff's complaints focused on "non-specific pain allegations in the neck, low back and mid back." (R. 22). The ALJ recounted Plaintiff's testimony that she cannot use her hands due to pain and cramps, and needs assistance to open jars and packages. (R. 19). Yet both state agency medical consultants found Plaintiff capable of fine and gross manipulations in April and July 2007. (R. 21). On this record, the ALJ fairly considered the hand evidence in assessing Plaintiff's limitations and credibility.

Significantly, the ALJ identified several factors that supported Plaintiff's statements regarding pain and limitations, and considered them in determining her RFC. For example, the ALJ noted that Plaintiff has had a "fairly aggressive course of multiple injections" with Dr. Patel, takes "a variety of pain medications, including extended-release narcotics since 2008," and has "sought consistent treatment for pain, including the narcotics with a likely sedating effect." (R. 22). Plaintiff also reported extremely limited activities of daily living, and has a good work history.[9] (R. 23). The ALJ concluded that Plaintiff is thus limited to

---

[9]    Of course, a claimant "is not entitled to a presumption of credibility based solely on his long work history." *Jones v. Apfel*, 234 F.3d 1273 (Table), at *2 (7th Cir.

performing unskilled, sedentary work that "involves little judgment to do simple tasks that can be learned on the job in a short period of time." (R. 22).

Plaintiff objects that a limitation to unskilled work fails to account for the sedating effects of her narcotic medication. In Plaintiff's view, "the ALJ ignores the fact that even unskilled jobs require workers to be 'on-task' and to keep up with the job's production rate." (Doc. 28-1, at 11). The VE did testify that employees must maintain a certain level of productivity to avoid being terminated. The VE also said, however, that employers reduce expected work rates by 20% to account for employee fatigue throughout the day. (R. 67-70). Here, Plaintiff has not identified a single physician who stated that her medications would cause her to be off-task at all, much less to a level below that required to maintain employment. Once again, "[i]t was because of and not in spite of [Plaintiff's] testimony that the ALJ limited her to a more restrictive residual functional capacity finding than any physician on the record." *Castile*, 617 F.3d at 929.

Plaintiff also claims that the ALJ erred by failing to explain why her "allegations lack overall consistency, as the location of her pain changes over time." (Doc. 28-1, at 12). The Court disagrees. The record reflects that throughout Plaintiff's treatment with Dr. Cavalenes, Dr. DePhillips, Dr. Chami and Dr. Patel, she reported receiving some benefit from each localized injection/procedure, after which the focus of her complaints moved to another area of her body. For example, when Plaintiff first saw Dr. Cavalenes in January 2007, her "biggest problem" was low back and left elbow pain. (R. 298). Following several injections and treatment with Lyrica, Plaintiff's pain was 40% better overall on April 19,

—————————————

2000).

29

2007, but she started complaining of increased pain in her right shoulder. (R. 365). Plaintiff stopped seeing Dr. Cavalenes in May 2007, and she told Dr. Patel in March 2008 that she experienced pain primarily in the mid cervical and lumbar spine, radiating to both shoulders and upper arms. (R. 522). Following DMBB and RFA treatments, Plaintiff's lower back pain improved by May 2008, but she complained of upper back pain. In August 2008, the pain was in her middle back. (R. 539, 547). The ALJ discussed Plaintiff's treatment with these physicians, and was not patently wrong in finding an overall inconsistency in the location of Plaintiff's pain.

In sum, the ALJ's credibility determination is supported by substantial evidence, and does not provide a basis for reversal or remand.

### 3. The VE's Testimony

In a final effort to reverse the Commissioner's decision, Plaintiff argues that the VE's testimony does not support the ALJ's conclusion at step 5 of the analysis that there are significant jobs available to her in the national or regional economy. She notes, for example, that "if the limitation on handling/fingering was reduced from 'frequent' to 'occasional,' there would be less than 201 jobs remaining." (Doc. 28-1, at 14-15). As explained earlier, however, the ALJ's finding that Plaintiff can engage in frequent handling and fingering is supported by substantial evidence. The Court has also rejected Plaintiff's second argument that the sedating effects of her medications would prevent her from sustaining the production rate required for unskilled work.

Plaintiff's remaining claim is that the DOT contains no jobs that are both sedentary and unskilled. (Doc. 28-1, at 15). Her only support for this position is an argument made in her Memorandum in Support of Request for Review to the Appeals Council. (R. 227-30).

There Plaintiff contended, without citation, that "there are only twenty-five sedentary inspector [jobs] total, and each one of them has an SVP [specific vocational preparation] level of three or more," meaning they are at least semi-skilled. (R. 229). Defendant identified, as examples, two sedentary positions that are unskilled, including dowel inspector (DOT 669.687-014) and film touch-up inspector (DOT 726.684-050). (Doc. 32, at 14). A recent case also identified doll inspector as sedentary and unskilled. *Ponton v. Commissioner of Social Sec.*, No. 08-2159, 2009 WL 2413927, at *2 (C.D. Ill. Aug. 4, 2009).

Plaintiff notes that the dowel inspector job has not been updated in the DOT since 1977, but she cites no authority suggesting that the position is no longer viable. (Doc. 39, at 3). Plaintiff also argues that the film touch-up inspector job requires constant reaching, handling and fingering. (*Id.*) (citing *Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles*, at 203). Regardless, even if some of the inspector jobs do not conform to Plaintiff's RFC, the VE identified 4,000 cashier jobs and 1,500 hand packer/sorter jobs that Plaintiff can perform. This constitutes a substantial number of jobs and supports the ALJ's step 5 determination. *See Coleman v. Astrue*, 269 Fed. Appx. 596, 2008 WL 695045, at *5 (7th Cir. Mar. 14, 2008) (citing *Lee v. Sullivan*, 988 F.2d 789, 794 (7th Cir. 1993)) ("1,400 jobs falls within the parameters of a sufficiently significant occupational base.") *See also Hastings v. Astrue*, No. 08 C 5041, 2010 WL 1609963, at *9 (N.D. Ill. Apr. 16, 2010).

## CONCLUSION

For the reasons stated above, Plaintiff's Motion for Summary Judgment [Doc. 27] is denied and Defendant's Motion for Summary Judgment [Doc. 31] is granted. The Clerk is directed to enter judgment in favor of Defendant.

ENTER:

Dated: April 20, 2011

_Sheila Finnegan_

SHEILA FINNEGAN
United States Magistrate Judge